UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-CR-90-SNLJ-ACL |
| | ) | |
| MARIO EVANS, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Mario Evans is charged with being a felon in possession of a firearm, knowingly possessing marijuana with the intent to distribute, and carrying the firearm in connection with the drug trafficking offense. [Doc. 2] He filed a Motion to Suppress Evidence [Doc. 29] alleging that officers violated his Fourth Amendment rights. Specifically, the Defendant claims that an officer unlawfully entered a car wash bay of a vacant business where the Defendant's car was parked, and then unlawfully seized a gun and marijuana observed in plain view on the driver's seat. *Id*. at 1-2. He also claims that items seized from the Defendant's person, digital scales and car keys, as well as statements made by the Defendant while in custody should be suppressed. *Id*.

An evidentiary hearing[1] was held [Doc. 35] and following the hearing, both parties submitted memoranda. [Docs. 43, 51] The undersigned recommends that the following findings of fact and conclusions of law be adopted and that the Defendant's Motion to Suppress Evidence be denied.

---

[1] Document 39 is the transcript ("Tr.") of the suppression hearing.

## II.  Proposed Findings of Fact

Close to midnight on August 2, 2013, Officer Brent Douglas of the Charleston Department of Public Safety was on duty and patrolling a high crime area near the intersection of West Marshall Street and South Green Street.  (Tr. 55-56)  Although the city of Charleston is a small town with a population of roughly 5,000 people, there is a high incidence of crime.  (Tr. 57)  The area where Officer Douglas was patrolling was within a six block area that is considered a very high crime area for drug dealings, shootings, and even murder.  (Tr. 57-59)  In addition, Officer Douglas was aware that there had recently been a number of burglaries in the area.  (Tr. 61)

On the southwest corner of Marshall and Green Streets there is an old, vacant car wash with which Officer Douglas was familiar.  (Tr. 56, 60)  The building has two bays for washing cars that are open on one side; vehicles can pull in or out of the bays from the south side of the building which is not visible to the main roadway of Marshall Street.  (Gov. Ex. #2 and #3; Tr. 24-25, Def. Ex. A/1 & B/2)  On the north side of the building, each car wash bay has a garage door that remains closed; the garage doors are visible to passersby on Marshall Street.  (Tr. 24; Def. Ex. A, originally marked as #1A)  Only one vehicle can fit in each of the bays.  (Tr. 25; Gov. Ex. #4)

Adjoining the garage bays is an enclosed area that was used for storage on August 2, 2013 (Tr. 32), which had previously served as a barbeque restaurant before the business shut down.  (Tr. 23)  While the car wash had been operated as a commercial business in the past, it had not been in operation for at least the five years prior to August 2013.  (Tr. 23, 29-31, 156)  During that time-frame, the city initiated the process to condemn the building.  (Tr. 30-31, 155-156)  The owner of the building (Freddie Evans, the Defendant's uncle (Tr. 20, 135)), however,

cleaned it up enough so the building would not be condemned.  (Tr. 23, 31)   There were no barricades or signs posted anywhere on the property to keep people out.  (Tr. 85-86)

While on patrol in the area of Marshall and Green Streets, shortly before midnight on August 2, 2013, Officer Douglas noticed that there was a car parked behind what the officer knew to be Freddie Evans' defunct car wash.  (Tr. 56, 59)  He also noticed that only the car's front lights were on.  (Tr. 59, 107)  Officer Douglas turned west onto Green Street, which runs on the east side of the car wash property and then stopped his patrol car behind the parked vehicle "to investigate what was going on."  (Tr. 59-61; Gov. Ex. #2)  As Officer Douglas approached the parked vehicle, he noticed that there was a second car parked in one of the car wash bays, as well as an individual standing near the driver's side of the car in that bay.  (Tr. 61-62, 112, 121)  That person emerged from the dark and walked toward Officer Douglas, who in turn shone his flash light in the person's direction.  (Tr. 65-66, 120-121)  Officer Douglas recognized the man on sight as the Defendant, Mario Evans.  (Tr. 66)  Officer Douglas knew the Defendant, because he had arrested the Defendant on a prior occasion and participated in an investigation of the Defendant.  (Tr. 66-67)  Based on that prior experience, Officer Douglas knew that the Defendant had prior felony convictions involving drugs, plus an arrest for First Degree Robbery and Armed Criminal Action.  (Tr. 68-69, 101-102, 122-124, 130, 186; Gov. Ex. #1)  Based on his prior knowledge, when Officer Douglas saw the Defendant, he was concerned that he was in a dangerous situation.  (Tr. 69-70, 72)

The area of the defunct car wash was not well lit as the only pole light was not functioning.  (Tr. 65)  In addition to seeing the Defendant emerge from the dark car wash bay, Officer Douglas also observed that there were two people in the parked car that originally caught his attention.  (Tr. 69)  Furthermore, Officer Douglas did not know whether or not there were any

additional people in the area of the Defendant's vehicle that was parked in the car wash bay.  (Tr. 69-70, 114-115)

When Officer Douglas was approached by the Defendant, the Defendant told Officer Douglas that his family owned the car wash.  (Tr. 113, 121, 128, 141)  From the moment Officer Douglas encountered the Defendant, he maintained visual contact of:  (1) the Defendant, (2) the occupants of the vehicle parked on the lot, as well as (3) the vehicle parked in the car wash bay.  (Tr. 69-70, 125)

Shortly thereafter, a backup officer arrived to the scene.  (Tr. 70, 125; Def. Ex. C)  When the backup officer arrived, Officer Douglas walked toward the car wash bay where the Defendant's car was parked to determine whether any other people were present.  (Tr. 70-71, 115-116)  Officer Douglas approached the passenger side of the vehicle parked in the bay (Tr. 72) and utilized his flashlight to inspect the interior of the Defendant's car.  (Tr. 70-71, 129-130)  He was looking for individuals, not evidence.  (Tr. 70-71, 120)  He discovered that no other person was in the vehicle, but he observed a handgun and a substance he believed to be marijuana in plain view on the driver's seat of the Defendant's car.  (Tr. 71, 73; Gov. Ex. #5)  Based on those observations, the Defendant was placed under arrest.  (Tr. 75)  A pat down search of the Defendant resulted in the discovery of a digital scale and a set of keys.  (Tr. 76)  The backup officer, Officer McDermott, pressed a button on a key fob[2] and the dome light went on in the Defendant's vehicle, which was parked in the car wash bay.  (Tr. 76, 117)  The Defendant was then placed in the rear of Officer Douglas' patrol unit.  (Tr. 76-77)

---

[2]     Officer McDermott did not testify at the suppression hearing.  On cross examination, Officer Douglas was not certain whether the Defendant's car was locked or unlocked when Officer McDermott operated the key fob.  (Tr. 117)  The Defendant did not recall whether or not he had locked the doors.  (Tr. 173)

In regard to the vehicle that was parked in the car wash bay, Officer Douglas believed it to be a black Ford and associated the vehicle with the Defendant, as he had seen the Defendant drive the vehicle on prior occasions. (Tr. 115, 133-134) In addition, the Defendant admitted that the vehicle parked in the car wash bay belonged to him (Tr. 139, 159, 194), although he stated that the vehicle was brown instead of black and the seats were tan (Tr. 192).

While the Defendant was secure in the patrol unit, Officer Douglas made contact with the occupants of the parked vehicle that had caused him to stop. (Tr. 77) A woman, Latrisha Banks (the Defendant's girl-friend) (Tr. 137), was in the driver's seat. (Tr. 77) Another woman was in the front passenger seat. Officer Douglas requested consent to search the vehicle and he received consent. *Id*. In searching the vehicle, Officer Douglas observed an envelope with money in it, a marijuana cigarette, and loose marijuana in a folded piece of paper in the backseat of the car. (Tr. 78) He also observed an empty plastic bag on the ground outside the passenger side of the car. *Id*. Both of the women were placed under arrest. (Tr. 80)

When the Defendant was taken to the station for processing, Officer Douglas did not intend to question the Defendant so he did not give the *Miranda* warning. (Tr. 82-83) During the booking process, the Defendant asked Officer Douglas what charges were going to be filed. (Tr. 83) Officer Douglas advised that the charges would be "possession with intent to distribute a controlled substance and felon in possession of a firearm." *Id*. The Defendant then asked, "[h]ow are you going to charge me with a gun? It doesn't even work. I just got it yesterday." (Tr. 84)

The Defendant's uncle, Freddie Evans, testified that he owned the defunct car wash and that the Defendant did not have an ownership interest in the car wash, although the Defendant had worked at the car wash approximately five or six years ago when the business was still open.

(Tr. 28-30, 32)  Evans also stated that he wouldn't object if anyone parked on the property surrounding the car wash. (Tr. 36)  He indicated that there were no fences around the car wash (Tr. 26, 37), there were no signs telling people not to trespass (Tr. 26, 36-37), and people could drive through the property to get to various other locations (Tr. 33-35).  Evans further testified that if suspicious activity was observed on the property he would want it to be checked out.  (Tr. 51)  Evans was a twenty-five year employee for the Missouri Department of Corrections (Tr. 27) and would not approve of anyone dealing drugs or bringing drugs on his property (Tr. 35-36).

The Defendant testified that the marijuana cigarette and loose marijuana found in his girl-friend's car belonged to him and that he had been seated in the backseat of the vehicle when Officer Douglas arrived at the scene.  (Tr. 173-174)  The Defendant claimed that the reason they were parked behind the building is because the women needed to go to the bathroom and he was trying to decide whether or not he was going to stay with his girlfriend.  Officer Douglas' arrival, however, didn't allow time for the girls to go to the bathroom.  (Tr. 165-167)  The Defendant admitted that he parked his car in the bay around 6 p.m., and then connected with his girl-friend. (Tr. 170, 172)  He also admitted that he had smoked marijuana earlier that evening and that he smokes marijuana every time he eats.  (Tr. 157-158, 161)  In regard to his use of the car wash, the Defendant indicated that he parked there from time to time and over the years he had actually stayed in the storage portion of the car wash when it was late at night and he didn't have anywhere else to sleep.  (Tr. 149-150, 152-53)  He claimed there was an operational bathroom inside the storage area of the car wash, but when pressed, agreed the electric was not operable in August 2013.  (Tr. 168-169, 182)  The Defendant had been kicked out of his girl-friend's apartment a day or so before his arrest (Tr. 177-178) and he "believe[d]" there was a bed in the storage room of the car wash (Tr. 180).

The undersigned heard the testimony of all the witnesses at the suppression hearing. The primary inconsistency in the testimony of the Defendant and Officer Douglas that has an impact on the issues in this case concerns the location of the Defendant when the officer arrived. Officer Douglas' testimony was that the Defendant was standing in the car wash bay on the driver's side of his vehicle. (Tr. 64) The Defendant, on the other hand, testified he was in the backseat of his girlfriend's car. (Tr. 139) Officer Douglas had no reason to lie and his testimony regarding the sequence of events was more credible. The Defendant on the other hand, admitted to smoking marijuana on the night in question (Tr. 158-159), had a motive to lie (Tr. 182-183), and his claim about why he was at the car wash when Officer Douglas stopped to investigate the parked car was not credible. The Defendant claimed that the women in his girlfriend's car were planning to use the bathroom in the storage room of the defunct car wash, however, the women who the Defendant claimed needed to go to the bathroom were simply sitting in the parked car with only the front lights on when Officer Douglas arrived. Furthermore, during the suppression hearing, the Defendant denied that the gun and marijuana were in his vehicle when he parked it in the car wash bay on August 2, 2013. (Tr. 190-191) On the night in question, however, the Defendant did not dispute the location of the gun, rather he said he didn't understand how he could be charged with being a felon in possession, because he purchased the gun the day before and the gun didn't work. (Tr. 84) The undersigned rejects the testimony of the Defendant as to the issue of where he was located when Officer Douglas arrived and accepts the testimony of Officer Douglas.

### III. Discussion

The Defendant confirms in his post-hearing brief [Doc. 43] that he believes the Court should suppress evidence seized from his vehicle that was parked in one of the car wash bays of

his uncle's defunct car wash business, as well as items seized from his person following his arrest and any statements he made while in custody. The Defendant believes that the aforementioned evidence should be suppressed based on his assertion that Officer Douglas was not "in a place where he had a right to be when he shined a flashlight and illuminated the interior of the [Defendant's vehicle]." *Id.* at 5. The Government opposed the Defendant's Motion. [Docs. 34, 51]

### III.A. To assert a Fourth Amendment violation a party must demonstrate a legitimate expectation of privacy in the area searched.

The Fourth Amendment of the United States Constitution protects "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. . ." U.S. Const. Am. IV. "Subject to a few narrow exceptions, a warrantless search or seizure violates the Fourth Amendment." *United States v. Zamora-Lopez*, 685 F.3d 787, 789 (8th Cir. 2012).

The Government argues that the Defendant lacks standing to challenge any search of the car wash bay where his vehicle was parked, because the Defendant failed to demonstrate that he possessed a legitimate expectation of privacy in the defunct car wash bay. [Doc. 51 at 23-27]

The Defendant, on the other hand, suggests that:

> he parked his vehicle inside of the garage at his uncle's property, and that by doing so he was possessing that portion of the building, and he had a right to expect that his vehicle would not be bothered, disturbed or observed except as might occur from <u>outside</u> the building.

[Doc. 43 at 10, emphasis added] The Defendant further alleges that the law of trespass as described in *United States v. Jones*, 132 S.Ct. 945, 949 (2012), should apply since he was "exercising a possessory interest" in his uncle's property and the officer's "intrusion into that private space constituted a trespass and thereby violated the defendant's Fourth Amendment

rights to privacy within the space he possessed." [Doc. 43 at 11] Absent from the record, however, is any evidence that the Defendant was an owner, possessor, or lessee of the vacant commercial property. Furthermore, the Defendant's case is clearly distinguishable from *Jones, supra*, which involved government agents committing a trespass when they installed a GPS device on Jones' Jeep in a public parking lot without a warrant. *Jones*, 132 S.Ct. at 948. The GPS device tracked Jones' movement for four weeks and resulted in the compilation of more than 2,000 pages of data regarding the location of Jones' Jeep within 50 to 100 feet. *Id.* The location information was transmitted by cellular phone to a Government computer. *Id.* The Defendant herein is alleging that officers trespassed into a car wash bay owned by another, which is clearly distinguishable from the officers' conduct in *Jones*, where a device that was capable of tracking significant location information was attached to Jones' Jeep without a warrant.

"The Fourth Amendment protects the people against unreasonable searches of 'their' effects, and an accused in a criminal case may not assert the Fourth Amendment rights of a third party." *United States v. Stringer*, 739 F.3d 391, 396 (8th Cir. 2014), *see also United States v. Nabors*, 761 F.2d 465, 468 (8th Cir. 1985) (Fourth Amendment rights may not be asserted vicariously.). "The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched." *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994); *see also Stringer*, 739 F.3d at 396. As the Eighth Circuit elucidated, "the person challenging the search has the burden of showing both a subjective expectation of privacy and that the expectation is objectively reasonable; that is, one that society is willing to accept." *United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999), citing *Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990). "If a defendant fails to prove a sufficiently close connection to the

relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *Gomez*, 16 F.3d at 256. A commercial area open to the public is not an area in which even the property owner of the commercial area can claim a reasonable expectation of privacy. *United States v. Dunn*, 480 U.S. 294, 316 (1987). In a case where an employee had been sleeping in the office of an auto repair garage without permission from the owner, the Tenth Circuit concluded that the employee did not have a reasonable expectation of privacy in that area when officers entered and searched the space during business hours. *United States v. Easterling*, 41 Fed.Appx. 201, 203-04 (10th Cir. 2002) (unpublished).

Courts have found that individuals have failed to demonstrate a reasonable expectation of privacy in a myriad of public locations, including: a shared business parking lot, the loading dock/parking area of business, motel parking lots used by motel guests, and common areas of apartment buildings. *See United States v. Reed*, 733 F.2d 492, 501 (8th Cir. 1984) (police officer's initial entry into business parking lot was not a search where lot was bordered by public streets on two sides and visible from public streets on two sides, plus the fenced gate was completely open to the public and shared by two separate businesses); *United States v. Edmonds*, 611 F.2d 1386, 1388 (5th Cir. 1980) (no legitimate privacy expectation in loading dock/parking lot area of business premises); *United States v. Diaz*, 25 F.3d 392 (6th Cir. 1994) (motel guest did not have a reasonable expectation of privacy in the motel parking lot where his car was parked and canine drug sniff of exterior of guest's vehicle did not violate the Fourth Amendment); *United States v. Stockton*, 2005 WL 2173705 (E.D.Mich. 2005) (no reasonable expectation of privacy in shared commercial driveway even though the gate entrance to the driveway was sometimes locked). *See also United States v. McGrane*, 746 F.2d 632, 634 (8th Cir. 1984) (rejecting a generalized expectation of privacy in the common areas of an apartment building).

*New York v. Class*, 475 U.S. 106, 118 (1986) (holding there is no reasonable expectation of privacy in a vehicle identification number, which is usually plainly visible from outside the car, either inside the door jamb or atop the dashboard).

As previously stated, the Defendant asserts that when Officer Douglas entered the garage bay of the defunct car wash where the Defendant had parked, the officer was intruding into space "possessed" by the Defendant and that by entering that space, the officer committed a trespass. [Doc. 43 at 11]  "For Fourth Amendment purposes, however, the 'inquiry focuses on [the Defendant's] expectations of privacy, not the propriety of [the officers'] conduct.'"  *United States v. Mohamed*, 2014WL1794690, *6 (D.Minn. 2014), citing *United States v. McGrane*, 746 F.2d 632, 634 (8th Cir. 1984).  Thus, whether the officer entered the defunct commercial property owned by the Defendant's uncle by trespass, or under some notion of implied authority based on the fact the car wash parking lot and car wash bays were completely open to the public is irrelevant to the ultimate inquiry of whether the Defendant had a reasonable expectation of privacy in the car wash bay.  *Mohamed*, 2014WL1794690 at *6.  Furthermore, the Defendant's mere presence in the car wash bay does not equate to "possession" of the area.

As stated by the Government, "no individual, even Mr. Freddie Evans, in light of the open and notorious use of the premises, could entertain a reasonable expectation of privacy in the [car wash bay where the Defendant's vehicle was parked]."  [Doc. 51 at 25]  Factors relevant to a determination regarding whether a defendant enjoys a reasonable expectation of privacy in a particular location, include:

> ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

*United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994).

   The Defendant was not the owner of the defunct car wash business (Tr. 29), nor did his uncle give him express permission to park in or use the car wash bay (Tr. 49).  The Defendant had taken no precautions to maintain privacy inside the garage (he was fully aware that "[r]eally anybody could have went in" the car wash bay (Tr. 149)), there were no signs or fences to keep the public away from the car wash bay (Tr. 47), and he did not have the ability to exclude others from the property, or to exert any kind of control over the use of the property by any other individual (Tr. 49, 168).  Five years prior to the date in question the Defendant had worked at the car wash.  (Tr. 29)  Furthermore, although the Defendant had slept in the storage room portion of the car wash structure at times when he had nowhere else to go[3] (Tr. 169); there was not even electric connected to the building at the time of the Defendant's arrest (Tr. 169).  *See McCaster*, 193 F.3d at 933 (resident of apartment had no legitimate expectation of privacy where he "failed to show any efforts to exclude others from the space, or any precautions to maintain privacy" and other people, including other tenants and landlord also had access to the space); *United States v. Rucker*, 545 Fed.App'x 567, 570, 71 (8th Cir. 2013) (no expectation of privacy where defendant "did not show a 'possessory interest' in the shared common area or that he had a means to exclude others from that space").  "To hold otherwise would allow a criminal to keep contraband from the legitimate reach of law enforcement by the simple act of storing it in a shared common area." *McCaster*, 193 F.3d at 933.

   The Court finds that the Defendant failed to show that he had a reasonable expectation of privacy in the defunct car wash bay, and as a result, he lacks standing to challenge Officer Douglas' warrantless entry into the car wash bay.  That conclusion, however, does not complete

---

[3]    *United States v. Dodds*, 946 F.2d 726, 728-29 (10th Cir. 1991) (no reasonable expectation of privacy in vacant apartment, even if defendant slept there occasionally).

the Court's examination of the officer's conduct in this case. The next question that must be addressed is whether the officer lawfully seized the items that were discovered in the Defendant's vehicle.

### III.B.   The Plain-View Exception

The Defendant concedes that in the event Officer Douglas had seized the gun and marijuana observed on the driver's seat of the Defendant's car pursuant to a routine traffic stop, such conduct "would not constitute an unlawful search." [Doc. 43] Although this concession has been made, the Defendant argues that Officer Douglas was not lawfully in a position to view those items.

The search of the Defendant's car and seizure of the gun, drug, and money will be examined under the plain-view and automobile exceptions to the Fourth Amendment's warrant requirement. The Framers of the Constitution intended that the Fourth Amendment would protect the people against unreasonable searches and seizures of their persons, houses, papers and effects by generally requiring a warrant supported by probable cause. While there is a preference for law enforcement officers to secure warrants before conducting searches, the Supreme Court has carved out a number of situations in which "flexible, common-sense exceptions" may nullify the warrant requirement. *Texas v. Brown*, 460 U.S. 730, 735-36 (1983), (citations omitted). Among the exceptions are the "plain-view" (*Coolidge v. New Hampshire*, 403 U.S. 443, 468 (1971)) and "automobile" (*United States v. Ross*, 456 U.S. 798 (1982)) exceptions to the warrant requirement.

The plain view doctrine is applicable when: (1) the police have a search warrant for a given area for specified objects and in the course of the search discover another article of incriminating character; (2) the initial police intrusion is not supported by a search warrant but

by another recognized exception, such as the discovery of evidence while in "hot pursuit" of a fleeing suspect; (3) the incriminating object becomes apparent during a search incident to an arrest; and, (4) the police are not searching for evidence against the accused but inadvertently discover an incriminating object. *See Horton v. California*, 496 U.S. 128, 135 (1990). In this case, it is the fourth situation that applies—Officer Douglas was not searching for evidence against the Defendant when he looked inside the Defendant's parked vehicle, rather he inadvertently discovered the gun and marijuana when he was checking the area to confirm there were no additional persons present who might pose a threat to the officers. (Tr. 70-71, 120)

"It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New Hampshire*, 403 U.S. 443,465 (1971). "The plain view doctrine permits law enforcement officers to seize evidence without a warrant when (1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself." *United States v. Weinbender*, 109 F.3d 1327, 1330 (8th Cir. 1997) (interim quotations omitted). *See also Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993), citing *Horton v. California*, 496 U.S. 128, 136-37 (1990); *Texas v. Brown*, 460 U.S. 730, 739 (1983) (plurality opinion). Of particular importance to this case is that "[t]here is no legitimate expectation of privacy, [citations omitted], shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." *Brown*, 460 U.S. at 740.

### III.B.1.     Officer Douglas was lawfully in a position to view the gun, marijuana and money.

The first factor to evaluate in the plain-view doctrine is whether the officer was lawfully in a position from which to view the gun, marijuana, and money. *Weinbender*, 109 F.3d at 1330.

"'Plain view is perhaps better understood. . .not as an independent 'exception' to the warrant clause, but simply as an extension of whatever the prior justification for an officer's 'access to an object' may be." *Texas v. Brown*, 460 U.S. 730, 738-39 (1983).  With that said, review of the first factor turns on an examination of the encounter between the Defendant and Officer Douglas, which progressed from a consensual encounter to an investigative detention.

### III.B.1.a. Officer Douglas had reasonable suspicion that criminal activity was afoot when he encountered the Defendant, which provided the legal justification for his presence at the defunct car wash where he observed the gun and marijuana in plain view on the driver's seat of the Defendant's car.

A police officer may stop and frisk a citizen if the officer has reasonable suspicion, based on articulable facts, that criminal activity is afoot.  *Terry v. Ohio*, 392 U.S. 1, 29-30 (1968).  *See also United States v. Sokolow*, 490 U.S. 1, 7 (1989); *United States v. Woods*, 2014 WL 1282292 at *2 (8th Cir. Apr. 1, 2014), citing *Terry*.  "A reasonable suspicion is a particularized and objective basis for suspecting criminal activity by the person who is stopped."  *United States v. Hightower*, 716 F.3d 1117, 1119-20 (8th Cir. 2013) (quotation omitted).  In determining whether reasonable suspicion exists, [courts] consider the totality of the circumstances in light of the officers' experience and specialized training."  *United States v. Preston*, 685 F.3d 685, 689 (8th Cir. 2012) (quotation omitted).

Moreover, if the officer reasonably believes the person with whom he is dealing is armed and dangerous, he is permitted to conduct a protective search of the person's outer clothing, and any weapons seized as a result of such a search "may be properly introduced into evidence against the person from whom they were taken."  *United States v. Cotter*, 701 F.3d 544, 547 (8th Cir. 2012) (quoting *Terry*, 392 U.S. at 30-31).  An "officer need not be absolutely certain that the individual is armed; the issue is whether a reasonable prudent man under the circumstances

would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27.

At the time of the incident in this case, Officer Douglas had roughly two years of law enforcement experience and had completed the law enforcement academy at Southeast Missouri State University. (Tr. 54-55) On the date in question, Officer Douglas was patrolling a high crime area late at night (a time when the incidence of crime is higher (Tr. 56)) when he observed a car parked behind a defunct car wash with only the front lights on. He knew there had been a recent rash of burglaries in the area. Officer Douglas stopped to investigate the vehicle. Once the patrol car was stopped and Officer Douglas began his approach to the parked vehicle, he noticed a man by a second vehicle that was parked in one of the car wash bays; that man walked directly toward the officer before the officer could reach the vehicle with the running lights on. Officer Douglas shone his flashlight on the man and immediately recognized the man as Mario Evans, the Defendant, a previously convicted felon and person who had been arrested for violent offenses in the past. At this point, Officer Douglas was concerned about his safety, because 1) he was familiar with the Defendant's criminal history, 2) he noticed there were two unknown people in the car with the running lights on, 3) it was dark and late at night in a high crime area, and 4) he did not know if there were any additional people in the Defendant's vehicle that was parked in the dark car wash bay. *See United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993) (relevant factors for determining whether a *Terry* stop violated the Fourth Amendment include: an area's crime rate; the nature of the questionable activity observed; the time of day; any suspicious behavior of the suspect; and the practical experience of officers involved in the stop"). The dangerous situation caused Officer Douglas to wait for back-up. Once the back-up officer arrived, Officer Douglas immediately entered the car wash bay to determine whether anyone else

was in the vehicle that might pose a risk of harm. When Officer Douglas shone the light through the front passenger side window of the Defendant's vehicle, he observed a gun and marijuana on the driver's seat. Officer Douglas then immediately arrested the Defendant and conducted a search incident to arrest. That search revealed digital scales and keys to the Defendant's car.

Based on the totality of the circumstances, the Court concludes that Officer Douglas had reasonable suspicion that Defendant was engaged in criminal activity sufficient to warrant an investigatory stop. *See United States v. Edmonds*, 948 F.Supp. 562, 565 (E.D.Va. 1996) (officer's observation in commercial district at 10:30 p.m., of a parked car in a no parking zone with lights and engine off, in area where there had been a recent wave of auto thefts was justified in believing that criminal activity was afoot).

### III.B.1.b. The protective frisk of the Defendant after Officer Douglas observed the gun and marijuana in plain view was lawful.

The Court further finds that Officer Douglas' arrest and frisk of the Defendant after observing the gun and marijuana in the Defendant's vehicle was justified under *Terry*, as well as the search incident to arrest exception to the warrant requirement, *New York v. Belton*, 453 U.S. 454 (1982). Additionally, any delay in Officer Douglas conducting the pat-down search or protective frisk was justified based on the officer's need to maintain visual contact with the parked vehicle with two passengers, the Defendant, and the area of the car wash bay where the Defendant's car was parked. *United States v. Bowers*, 2006 WL 277094,*5 (D.Neb. 2006) (unpublished) (". . .delay in conducting a pat-down does not, by itself, eliminate the justification for a pat-down search), citing *United States v. Menard*, 95 F.3d 9, 11 (8th Cir. 1996).

Based on the foregoing, the Court further finds that Officer Douglas was lawfully in a position to view the gun and marijuana in the driver's seat of the Defendant's vehicle.

### III.B.1.c. The arrest of the Defendant without a warrant was supported by probable cause.

The Defendant was arrested immediately after Officer Douglas discovered the gun and marijuana in plain view on the driver's seat of the Defendant's vehicle. The arrest of a defendant is lawful even if made without a warrant if the arrest was made with probable cause. *See United States v. Watson*, 423 U.S. 411, 417 (1976). This is true even when the felony alleged occurred outside of the presence of law enforcement officers. *Id*. at 418. "Probable cause exists when officers possess information that would 'warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *United States v. Travis*, 993 F.2d 1316, 1323 (8th Cir. 1993) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)) (alteration in original). *Accord United States v. Hawkins*, 59 F.3d 723, 727 (8th Cir. 1995); *United States v. Morales*, 923 F. 2d 621, 623 (8th Cir. 1991). The court is to "remain mindful that probable cause is a practical, factual, and nontechnical concept, dealing with probabilities." *United States v. Reinholz*, 245 F.3d 765, 776 (8th Cir. 2001).

In this case, the information known to Officer Douglas once he observed the gun and marijuana in the driver's seat of the Defendant's car was sufficient to support his belief that the Defendant was committing the offenses of possession with intent to distribute a controlled substance and felon in possession of a firearm.

### III.B.2. The incriminating nature of the gun and marijuana was immediately apparent.

The next factor to consider under the plain-view doctrine is whether the incriminating nature of the gun and marijuana was immediately apparent. *Weinbender*, 109 F.3d at 1330. A photograph of the items was admitted into evidence during the suppression hearing. (Gov. Ex.

#5) That photograph shows that the items in question were in full view of an onlooker by simply looking through the driver's and front passenger side windows. When Officer Douglas saw the gun, he immediately recognized it as a gun and knew the vehicle belonged to the Defendant and that the Defendant was a previously convicted felon, making the possession of the gun a crime. Additionally, the officer immediately recognized the green, leafy substance on the driver's seat to be marijuana, the possession of which is also illegal in Missouri. Finally, although Officer Douglas does not recall seeing the cash when he shone a light into the Defendant's vehicle, the fact cash was found in very close proximity to a gun and marijuana warranted the seizure of the money after it was observed. Officer Douglas did not recall noticing the money until the second time he approached the Defendant's vehicle to assist with processing the scene.

**III.B.3.    Officer Douglas had a lawful right of access to the interior of the Defendant's vehicle.**

The third and final factor to evaluate under the plain view doctrine is whether Officer Douglas had a lawful right of access to the interior of the Defendant's vehicle so as to seize the gun. *Weinbender*, 109 F.3d at 1330. This question is answered by reviewing the automobile exception to the warrant requirement.

**III.B.3.a.    The automobile exception to the warrant requirement provided Officer Douglas' lawful right of access to the gun and marijuana that he observed in plain view on the driver's seat of the Defendant's vehicle.**

Police may search an automobile or other vehicle without a warrant if they have probable cause to believe that the vehicle contains contraband or other evidence. *Chambers v. Maroney*, 399 U.S. 42, 52 (1970); *Carroll v. United States*, 267 U.S. 132, 162 (1925).

The Supreme Court "has recognized significant differences between motor vehicles and other property which permit warrantless searches of automobiles in circumstances in which warrantless searches would not be reasonable in other contexts." *United States v. Chadwick*, 433

U.S. 1, 12 (1977).  This distinction is based partly on the mobility of vehicles, "which may create exigencies making a warrant impracticable, and partly on the diminished expectation of privacy associated with the automobile."  *United States v. Alden*, 576 F.2d 772, 775 (8th Cir. 1978).  The act of looking through a car window is "not a 'search' [for Fourth Amendment purposes,] because a person who parks a car—which necessarily has transparent windows—on private property does not have a reasonable expectation of privacy in the visible interior of his car." *United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995), citing *Texas v. Brown*, 460 U.S. 730, 740 (1983).  The *Hatten* Court further held that the fact the officer had to use a flashlight to see through the car's tinted windows was of no consequence, because "[t]he windows were still transparent."  *Hatten*, 68 F.3d at 261.

Although it is not clear from the record whether the Defendant's vehicle was locked or unlocked, that does not impact the analysis.  This is because the automobile exception provided Officer Douglas with authority to enter the car.  *United States v. Galaviz*, 645 F.3d 347, 357 (6th Cir. 2011).  In *Galaviz*, the Sixth Circuit found the seizure of a gun from a locked automobile was lawful where a wrecker service unlocked the car doors after officers observed a recognizable part of the gun under the driver's seat in plain view.  *Id.*  The *Galaviz* Court noted that while the act of the wrecker service in unlocking the car doors was permissible, the preferred course would be to secure the car and secure a warrant before forcing entry.  *Galaviz*, 645 F.3d at fn. 7.

The Eighth Circuit upheld the search of a locked car under the automobile exception where an officer gained entry by using a "slim-jim."  *United States v. Perry*, 925 F.2d 1077, 1079-80 (8th Cir. 1991).  *See also United States v. Cowan*, 674 F.3d 947, 956-57 (8th Cir. 2012) (use of key fob to locate a vehicle is permissible when supported by probable cause).

The officer in this case had a lawful right of access to the items in the vehicle based on the automobile exception to the warrant requirement, because Officer Douglas had probable cause to believe the vehicle contained evidence of a crime. *Galaviz*, 645 F.3d at 357. Officer Douglas' observation of a gun and marijuana, the possession of which constituted violations of Missouri law, provided the necessary probable cause. This satisfies the third prong of the plain view doctrine.

The Court finds that all factors of the plain view doctrine have been met.

**III.C.  The Defendant's Statements**

The Defendant claims that the statements he made while in custody were taken in violation of the Fifth Amendment [Doc. 43 at 1] and in violation of the fruit of the poisonous tree doctrine [Doc. 43 at 11]. The record, however, is quite clear that the reason Officer Douglas did not give the Defendant the *Miranda* warnings was because he did not intend to interrogate the Defendant. Furthermore, the incriminating statements made by the Defendant were volunteered. The Eighth Circuit "ha[s] repeatedly held that '[a] voluntary statement made by a suspect, not in response to interrogation, is not barred. . .and is admissible with or without the giving of *Miranda* warnings." *United States v. Turner*, 157 F.3d 552, 556 (8th Cir. 1998) (citations omitted).

Insofar as the Defendant made statements during the *Terry* stop, those statements should not be suppressed. "No *Miranda* warning is necessary for persons detained for a *Terry* stop." *United States v. Pelayo-Ruelas*, 345 F.3d 589, 592 (8th Cir. 2003) (quoting *United States v. McGauley*, 786 F.2d 888, 890 (8th Cir. 1986)). Moreover, the "noncoercive aspect of ordinary traffic stops prompts [the court] to hold that persons temporarily detained pursuant to such stops

are not 'in custody' for the purpose of *Miranda*." *Pelayo-Ruelas*, 345 F.3d at 592 (alteration added).

**III.D.  Additional evidence not addressed in Defendant's motion.**

As the Defendant's suppression motion does not seek to suppress the additional marijuana and money that was seized from his girl-friend's car, the Court will not conduct an analysis of the seizure of those items.

## IV.  Conclusion

IT IS HEREBY RECOMMENDED that the Defendant's Motion to Suppress [Doc. 29] be DENIED.

The parties are advised that they have fourteen days in which to file written objections to the Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

_____
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 30th day of July, 2014.